Filed 9/30/25  P. v. Mott CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C101031 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F04345) |
| v. | OPINION ON TRANSFER |
| RESHAY MOTT, | |
| Defendant and Appellant. | |

Opinion following transfer from Supreme Court.

Defendant Reshay Mott appeals from an order denying her petition under Penal Code section 1172.6.[1]  She contends there is insufficient evidence to support the trial court's conclusion that she could still be found guilty of murder under current law.

---

[1]  Undesignated statutory references are to the Penal Code.

1

We previously affirmed the order of the trial court. Subsequently, our Supreme Court granted defendant's petition for review and ultimately transferred the case back to us with directions to vacate our prior decision and reconsider the matter in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*). We vacated our decision and the parties submitted supplemental briefs. Defendant argues the Supreme Court's analysis in *Emanuel* of the factors that guide the assessment of reckless indifference to human life establish that the trial court erred in denying her petition for resentencing. The People argue *Emanuel* is distinguishable from this case. Upon reconsidering the cause in light of *Emanuel*, we again affirm the order.

FACTS AND PROCEEDINGS

In 2014, the People charged defendant and codefendant Elliton Jay-Twan Varnado with the murder of Dominic Lafazia (§ 187, subd. (a); count one), attempted robbery of Lafazia (§§ 664/211; count two); robbery of C.C. (§ 211; count three), assault with a firearm on C.C. (§ 245, subd. (a)(2); count four), robbery of N.D. (§ 211; count five), and assault with a firearm on N.D. (§ 245, subd. (a)(2); count six). As to count one, the information alleged firearm enhancements against Varnado (§§ 12022.5, 12022.53, subds. (b), (c), (d)) and a special circumstance against Mott and Varnado (§ 190.2, subd. (a)(17)(A) [murder during robbery or attempted robbery]). The information further alleged firearm enhancements against Varnado as to count two (§§ 12022.5, 12022.53, subds. (b),(c), (d)), count three (§ 12022.53, subd. (b)), count four (§ 12022.5, subds. (a), (d)), count five (§ 12022.53, subd. (b)), and count six (§ 12022.5, subds. (a), (d)).

A jury found defendant and Varnado guilty of all counts and found true the special circumstance and firearm enhancements.

In November 2014, the trial court sentenced defendant to life without the possibility of parole on count one, the upper term of five years on count three, and the middle term of three years with two years stayed on count five. The court stayed sentences on counts two, four, and six under section 654. Defendant's aggregate sentence

2

was life without the possibility of parole plus six years.  In 2018, this court affirmed the judgment with a minor correction to the clerk's minutes regarding the jury verdict on count one.  (*People v. Varnado* (Dec. 12, 2018, C077847) [nonpub. opn.].)

In July 2023, defendant petitioned for resentencing under section 1172.6.[2]  The trial court appointed counsel and received briefing from the parties.  The People conceded that defendant made a prima facie showing for relief under section 1172.6 and the court issued an order to show cause.  The parties filed additional briefs.  The People relied solely on the transcripts from the trial as evidence. No additional evidence was presented at the evidentiary hearing.

*Victim and Witness Trial Testimony*

According to the evidence, in May 2013, C.C. (victim) posted an ad on Craigslist in the section for men seeking women.  Defendant responded to the ad.  C.C. and defendant corresponded back and forth, first by e-mail and then by text messages.  Defendant texted C.C. that he should come to her apartment and gave him an address on Mack Road.  C.C. drove to the area.  He did not like the look of the apartment complex at the address defendant gave him.  He pulled into a church parking lot next door.  C.C. told defendant where he was, and she agreed to come out and meet him.  Defendant walked up from behind C.C.'s car, got in, and immediately got out.  A man got into the passenger seat, and another man opened the driver's side door and pointed a gun at C.C.  At trial, C.C. testified that he believed Varnado was the man on the driver's side but was not sure. The man in the passenger seat struck C.C. in the head with a gun while repeatedly yelling, "where is it?"  C.C. threw his wallet at the man and both men fled.

---

[2]  In February 2019, defendant filed an initial petition under former section 1170.95 that the trial court denied in May 2022.  Section 1170.95 was renumbered as section 1172.6 without change to the text effective June 30, 2022.  (Stats. 2022, ch. 58, § 10.)  We refer to the statute as section 1172.6.

C.C. drove home. He did not immediately contact the police because he was scared. C.C. received a phone call from a man asking for the PIN to his ATM card. At first C.C. refused but then complied after the man threatened C.C.'s daughter. The money the robbers withdrew from the ATM plus the cash in C.C.'s wallet totaled several hundred dollars.

Defendant had given C.C. her full name, and he looked her up on Facebook. He recognized defendant in her photos, as well as Varnado, who was in most of the photos. C.C. called the police and provided a detective with the photos.

In June 2013, (victim) N.D. posted an ad on Craigslist. Defendant responded and they exchanged e-mails. Defendant sent N.D. a photo. N.D. wanted to meet her. Defendant gave him her phone number and an address on Mack Road. N.D. drove to the address in his black Dodge Charger. When he got there, he did not want to pull into the apartment complex. N.D. called defendant and asked her to come out. She told N.D. he had to pull into the complex and he complied. She walked up to the car and N.D. rolled down the window. Defendant leaned in the window and began talking. The passenger door opened and a man N.D. identified in court as Varnado entered holding a gun. He started hitting N.D. in the back of the head (six to eight times) with the butt of the gun and demanded money.

N.D. told Varnado to take what he wanted, and Varnado ordered N.D. out of the car and took his keys and his Samsung Galaxy S4 phone. Varnado hit N.D. again. N.D. handed his wallet to Varnado, who took the money out and gave back the wallet. Varnado threw the keys in the car and ran back to the apartments. A day later Varnado sold a Samsung Galaxy S4 phone to a Game Stop store.

N.D. called the police and met with a detective. N.D. identified defendant and Varnado in Facebook photos the detective showed him. Another detective showed N.D. a photo of a cell phone, which he recognized as his by the screensaver his daughter had loaded on the phone.

4

On June 30, 2013, (victim) Lafazia posted a Craigslist ad in the casual encounters section. Defendant responded to the ad by e-mail. After exchanging e-mails, Lafazia asked defendant to communicate with him directly by text. Defendant and Lafazia set up a meeting for July 5, 2013. Lafazia drove to where defendant directed him to go but she did not show up. On July 7, 2013, defendant texted Lafazia the address of an apartment in the complex on Mack Road. The last message Lafazia sent to defendant was 10 minutes before a 911 call reporting that he had been shot.

In the early morning hours of July 7, 2013, (witness) E.M. awoke in his bedroom in an apartment complex on Mack Road. His bedroom window faced the parking lot. E.M. heard two people talking. One hostile-sounding voice asked, "where is my money?" He heard the two people arguing and then a gunshot. E.M. then heard someone calling for help and yelling, "I've been shot!"

After midnight on July 7, 2013, (witness) M.F. was watching television in her apartment in the complex on Mack Road. She heard a shot. M.F. told her boyfriend, who went outside. He came back in and told M.F. to call 911. M.F. called 911 and ran outside. She heard someone yelling, "I got shot," and calling for help. M.F. saw a man holding a gun against his chest. The man told M.F. that he was Dominic, a black man had shot him, and he had taken the gun away from the man.

Around 1:00 a.m., (witness) W.H. was in an apartment in the complex on Mack Road when he heard a shot. W.H. went to the window and saw two people fighting. One man was older and the other younger. They were wrestling for a gun. When W.H. came out, he recognized an injured man as one of those fighting. The younger man he fought was black. A police officer responding to the scene observed the victim lying at the base of a staircase. Two or three people were holding a bloody towel on his chest. The officer located a gun lying next to a dark colored sweatshirt and a sandal. There was blood on the handgun and also on a sweatshirt. The semiautomatic gun had the slide in the forward position and no magazine in the gun. When the officer pulled the slide back,

5

there was a bullet in the chamber that jammed and did not eject. Another officer found a magazine with six bullets in it and a bloody t-shirt. Lafazia died from a gunshot wound to the chest. He had an injury to the top of his head similar in shape to the trigger guard on the firearm found at the scene.

On July 8, 2013, police executed a search warrant for defendant's mother's apartment in the complex on Mack Road and found Lafazia's phone. Defendant and Vornado were present in the apartment. Police also found a box containing the same type of ammunition as the magazine found at the scene.

*Defendant's Trial Testimony and Prior Statements*

Defendant testified that Varnado's cousin used a phone defendant shared with Varnado to arrange the meeting with C.C. Defendant walked out to the church parking lot with Varnado and his cousin behind her. Varnado did not have a gun, and defendant did not see Varnado's cousin with a gun. Defendant walked up to the passenger window of a silver truck and said her name. The driver asked her to get in. Defendant did not get in; she just said a couple more things and walked home. She saw Varnado's cousin walk to the passenger's side and Varnado to the driver's side. Defendant did not receive any proceeds from the robbery. Varnado later told defendant that his cousin lied about not harming anyone; Varnado saw his cousin hitting C.C. She similarly denied she was part of the plan to rob N.D. She knew Varnado's cousin was going to do something because he borrowed her phone. Defendant bought a Samsung Galaxy 4 phone from Varnado's cousin. She was unable to transfer her phone service to it, so she told Varnado to sell it to Game Stop.

Defendant testified that she contacted Lafazia on Craigslist and agreed to meet with him, but she did not go because she was scared. When Lafazia said he would pay her $350, she agreed to another meeting at her apartment complex. When Lafazia arrived, defendant got in his truck, leaving the door cracked open. Varnado was asleep in the apartment. Lafazia suggested they go somewhere to have sex. Defendant said she

6

was uncomfortable with that, and Lafazia responded she was acting like a "stuck up bitch." They exchanged words, and defendant got out of the truck and kicked the door shut. Lafazia followed, grabbed defendant by her hair, put his hand over her mouth, told her if she screamed he would break her neck, and dragged her back past his truck towards an alcove. Lafazia then dragged defendant back to the truck to get his "fun bag." Defendant heard Varnado shout her name. Varnado came up, pushed Lafazia, and told him to let defendant go. Defendant ran back to her apartment. Soon after that, Varnado limped up the stairs. He had lost his shirt and had a bump on his head, a scratch on his ear, and his knees and mouth were bleeding. He did not bring home a cell phone.

A detective interviewed defendant the day after Lafazia was shot. Defendant admitted the robberies of C.C. and N.D. She said the plan was to rob Lafazia. Varnado's role was to make sure defendant was safe. Lafazia was unaware that Varnado was close by watching. Things went wrong when Lafazia called defendant names and grabbed her hair. Varnado rushed up and hit him with the gun. Defendant fled but heard the gunshot.

At trial, defendant testified that she told the detective in the interview what he wanted to hear.

While incarcerated, defendant sent jailhouse messages or "kites" to Varnado. In one kite, she wrote Varnado, "we need to start getting our stories straight and airtight." In another, she wrote "we should have told that detective to go fuck his self, but we can say we told him what he wanted to hear because he wouldn't listen to the truth. And we was scared so we told him lies and admitted to stuff we didn't do." Defendant also wrote a kite telling Varnado "don't take nothing for me. I can take them robberies," and "I have no choice but to . . . take'em. They got my phone records." Defendant then wrote Varnado, "you keep saying you wanna take the 211s, but what you don't get, if you admit to two violent armed robberies and the jury see the 187 dude got hit on his head, just like them two, they're going to say you was robbing fat bro, too" "but he just fought back." In another kite, defendant wrote Varnado, "my attorney came this week and said you

7

getting in a fight with him because he had me choked up is good for us to say. But in your interrogation with that detective, you said you walked up, pointed the gun at his face and told him to give me everything. Babe, you have to say you were lying when you said that. There was no plan to rob this man, and we didn't try to rob him. No robbery, period. Do you hear? Our life depends on this shit." In a lengthy message, defendant detailed a scenario regarding the killing of Lafazia that she said Varnado needed "to memorize and tell your attorney and also have it in your head, and we get no deals, only go to trial because they will twist you and try to confuse you."

*Varnado's Defense*

Varnado testified that on July 7, 2013, he saw defendant struggling with a "big guy," Lafazia, in the parking lot of their apartment complex. Varnado came up behind Lafazia, pushed him, and told him to get off Varnado's girlfriend. Words escalated into a fist fight. When Lafazia pulled Varnado's sweater over his head, Varnado pointed his gun at Lafazia and told him to step back. Lafazia charged Varnado, picked him up, and slammed him to the ground. Lafazia got on top of Varnado and they struggled over the gun. The safety was on and the gun was pointed in the air. Lafazia got the gun away from Varnado and hit him in the forehead with it. Varnado tried to pull the gun away and got hold of the handle while Lafazia held the barrel. They were wrestling for the gun on the ground when it went off. Varnado saw blood all over his face and shirt. Lafazia yanked the gun away and pointed it at Varnado. Varnado heard the sound of metal hitting the ground and assumed it was the clip. Lafazia appeared to be trying to shoot, so Varnado pushed Lafazia's hand away. Lafazia grabbed Varnado, choked him, and hit him with the gun. Lafazia was standing hunched over and Varnado was on the ground trying to get up. Varnado bit Lafazia on the hand and he let go. Lafazia walked off with the gun and Varnado fled.

A detective interviewed Varnado. Varnado stated that he saw Lafazia holding defendant by the arm, pointed a gun at him, and told him to give Varnado everything he had. Varnado testified at trial that he told the detective this because Varnado was under the influence of marijuana, wanted to the get the interview over with, and did not want to get defendant in trouble and put the blame on himself. Varnado admitted that in the other two robberies the victims did not fight back, but he hit them with the gun to make them give up the money. Varnado also admitted he used the same gun in all three crimes.

*Ruling on the Petition*

The trial court denied the petition, finding beyond a reasonable doubt that defendant was a major participant and acted with reckless indifference to human life. As to the major participant element, the court characterized defendant as "the mastermind of the scheme" and noted that she had organized setting up and facilitating the robberies. Defendant's kites directing Varnado's trial behavior further confirmed she orchestrated the scheme.

The trial court deemed whether defendant acted with reckless indifference to human life to be a "somewhat closer . . . question." Reviewing the facts, the court found defendant knew a gun was involved, noting "the gun is really the key aspect to the robbery." The gun caused the victims to give up their valuables in fear for their life and safety. It was almost inevitable, the court reasoned, that the gun would be fired at some point, because hitting a victim with a gun would not work in every case and did not in this case. Defendant was shown to have reckless indifference to human life given her participation in robberies made successful by the presence of a gun.

The trial court found it unnecessary to rule on the People's alternate argument that defendant directly aided and abetted implied malice murder. Defendant filed a timely appeal.

9

DISCUSSION

I

*Major Participant/Reckless Endangerment*

Defendant argues there was insufficient evidence for the trial court to find she was a major participant in the attempted robbery and acted with reckless indifference to human life.  We disagree.

A.  *Relevant Law*

As relevant here, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended section 189 to state that a person can be liable for felony murder only if:  (1) the "person was the actual killer"; (2) the person, with an intent to kill, was an aider or abettor in the commission of murder in the first degree; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life."  (§ 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 3.)

Where the trial court issues an order to show cause and holds an evidentiary hearing, as here, the prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder under California law as amended by the changes made by Senate Bill No. 1437.  (§ 1172.6, subd. (d)(3).)  The parties may offer evidence from a prior trial or new or additional evidence at the hearing.  (*Ibid.*)

We review the trial court's denial of a section 1172.6 petition for substantial evidence.  (*People v. Njoku* (2023) 95 Cal.App.5th 27, 41-43.)  Under this standard, we " ' " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.' " ' [Citation.]  Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any

10

substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' " (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480.) Reversal is not warranted unless " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the trial court's ruling]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court considered, respectively, the major participant and reckless indifference elements. To be a major participant means a defendant's personal involvement must be "substantial" and greater than the actions of an ordinary aider and abettor to an ordinary felony murder. (*Banks,* at p. 802.)

Our Supreme Court identified the following factors to consider in determining whether a defendant acted as a major participant: (1) " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths?' "; (2) " 'What role did the defendant have in supplying or using lethal weapons?' "; (3) " 'What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?' "; (4) " 'Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?' "; and (5) " 'What did the defendant do after lethal force was used?' " (*Clark, supra,* 63 Cal.4th at p. 611, quoting *Banks, supra*, 61 Cal.4th at p. 803.) It is not necessary that each factor be present, but neither is the presence of a single factor dispositive. Instead, "[a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Banks*, at p. 803.)

Regarding the element of reckless indifference to human life, our Supreme Court has explained that a defendant must be " ' "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' " (*Banks, supra*, 61 Cal.4th at p. 807;

11

*Emanuel, supra*, 17 Cal.5th at p. 883.) The question is "whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' [Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating recklessness to the significant risk of death his or her actions create." (*Banks*, at p. 801; *Emanuel*, at p. 884.) This requires more than the foreseeable risk of death inherent in any armed crime. (*Banks*, at p. 808; see also *Clark, supra*, 63 Cal.4th at pp. 617-618 [participation in an armed robbery, alone, does not demonstrate reckless to human life].) Instead, the defendant must consciously disregard a substantial and unjustifiable risk to human life. (*Clark*, at p. 617; *Emanuel*, at p. 884.) In addition to the subjective component, the reckless indifference element also encompasses an objective component; a reviewing court asks whether the defendant's behavior was a " 'gross deviation' " from what a law-abiding person would have done under the circumstances. (*Clark*, at p. 617; *Emanuel*, at p. 884.)

Acknowledging the overlap between the major participant and reckless indifference elements (*Clark, supra,* 63 Cal.4th at pp. 614-615), our high court set forth the following list of nonexclusive factors to be considered in determining whether a defendant acted with reckless indifference to human life: (1) a defendant's knowledge of weapons, and use and number of weapons; (2) a defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) a defendant's knowledge of the cohort's likelihood of killing; and (5) a defendant's efforts to minimize the risks of the violence during the felony. (*Id.* at pp. 618-623; *Emanuel, supra*, 17 Cal.5th at pp. 884-885.) No one factor is required or dispositive. (*Clark*, at p. 618; *Emanuel*, at p. 885.) We analyze the totality of the circumstances to determine whether defendant acted with reckless disregard to human life. (*In re Scoggins* (2020) 9 Cal.5th 667, 677; *Emanuel*, at p. 885.)

In addition, numerous courts have recognized that a defendant's youth is a factor in determining reckless indifference to human life. (See, e.g., *People v. Harris* (2021) 60 Cal.App.5th 939, 960 ["given Harris's youth at the time of the crime [17 years old], particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that Harris was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants' "]; *In re Moore* (2021) 68 Cal.App.5th 434, 454 [a "defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life"].)

B.  *Analysis*

Applying the relevant factors, we conclude substantial evidence supports the trial court's determination here.

1.  *Major Participant*

Defendant was clearly a major participant, as shown by evidence she planned, set up, and facilitated the attempted robbery of Lafazia. She contacted Lafazia via Craigslist, arranged the meeting, directed him to meet her at the apartment complex on Mack Road-- just as she did in the robberies of C.C. and N.D.--and went out to meet him. Defendant knew that Varnado was close by watching and that he was not only armed but also violent, based on his conduct in the prior robberies.

While no evidence supports a finding defendant supplied the weapon, she did tell the detective that Varnado brought a gun and hit C.C. and N.D. with it "to get their stuff," even though they complied with his demands to hand over their money. Defendant admitted that she saw Varnado hit N.D. with the gun. She acknowledged that neither of these men accosted her as she said Lafazia did. Thus, defendant knew Varnado used the gun to pistol whip *compliant* victims, making it likely he would use the gun in an even more violent manner in the face of resistance.

13

While defendant argues she was not present during Lafazia's killing, the evidence belies this contention. Defendant told the detective she was at the scene as Varnado began to fight with Lafazia, and that she saw Varnado hit Lafazia with the gun and heard the gunshot. Defendant suggested she looked back at Lafazia and Varnado when she heard the gunshot. The detective asked: "[S]o when [Varnado] shows up and you're trying to get away with [Lafazia's] money he's grabbing on to you to prevent you from stealing his money, [Varnado] shows up and has words with and confronts him. You take off runnin', that's the last you see of anything." Defendant responded: "Until I heard the gunshot."

Despite hearing the gunshot and looking back, defendant did nothing to restrain Varnado or aid Lafazia when he called for help after being shot. (*People v. Montanez* (2023) 91 Cal.App.5th 245, 280 [defendant "was on foot and just 50 yards away from the scene of the crimes when he heard the gunshot," and had every reason to suspect his accomplice shot the victim, and "yet he did not turn back to see if any of them was wounded or in need of aid"]; *In re Harper* (2022) 76 Cal.App.5th 450, 462 [defendant was close enough to hear the gunshot but made no attempt to help the victim].) Finally, as the trial court noted, defendant's conduct after the killing, i.e., the kites defendant wrote to Varnado, further indicated her control of Varnado and orchestration of the robbery scheme. In sum, substantial evidence supported the finding that defendant was not a passive participant but was actively planning and participating in the underlying felony that led to Lafazia's death.

### 2. *Reckless Indifference*

In *Emanuel*, the Supreme Court reversed the appellate court's affirmance of the trial court's denial of a section 1172.6 petition, based on our high court's conclusion there was insufficient evidence to support a finding that Emanuel acted with reckless indifference to human life. (*Emanuel, supra*, 17 Cal.5th at p. 875.)

14

In that case, the victim Sonenberg agreed to sell a pound of marijuana to Emanuel and his codefendant Whitley. (*Emanuel, supra,* 17 Cal.5th at p. 876.) Sonenberg arranged to meet Emanuel near a public park in the afternoon. (*Id.* at p. 876.) Sonenberg was inside of his truck when Whitley and Emanuel approached the truck on a residential street. (*Id.* at p. 891.) Whitley pulled a handgun on Sonenberg, hit him with the gun, pointed it at Sonenberg's leg, and demanded the marijuana. (*Id.* at pp. 878, 891.) Sonenberg refused to give up the marijuana, so Emanuel said " 'let's go' " and started to leave. (*Id.* at pp. 879, 891.) Sonenberg then tried to push Whitley's handgun away from him. (*Id.* at pp. 878, 895-896.) Whitley's handgun fired once, striking Sonenberg in the neck. (*Ibid.*) First responders found Sonenberg lying against a curb. (*Id*. at p. 877.) He "died at the scene from a 'close-range' gunshot wound to the right side of his neck that perforated his carotid artery." (*Ibid.*)

The court analyzed each of the *Clark* factors to determine whether as applied to the facts the factor favored or did not favor a finding of reckless indifference to human life or was neutral as to that factor. (*Emanuel, supra*, 17 Cal.5th at pp. 885-896.) As we next explain, here the facts of defendant's crimes are largely distinguishable from those in *Emanuel* as applied to the factors analyzed by the high court in that case.

> a.   *Use or Awareness of the Presence of Weapons and Knowledge of Cohort's Likelihood of Killing*

The court in *Emanuel* relied on the findings of the lower courts that prior to the robbery Emanuel did not know his confederate Whitley possessed a gun, would bring a gun to the robbery, or was likely to use lethal force. The Supreme Court concluded this factor did not weigh in favor of a finding of reckless indifference. (*Emanuel, supra*, 17 Cal.5th at p. 885.)

Here, defendant did not use a weapon but she clearly knew Varnado would bring a gun to the robbery of Lafazia. She knew Varnado had used the gun to pistol whip the two prior robbery victims, C.C. and N.D., who had offered no resistance. Thus, prior to the

15

robbery and death of Lafazia, defendant knew Varnado used a gun to commit, as she put it in a jailhouse message, "two violent armed robberies" of compliant victims. This knowledge supports an inference that she was aware it was likely Varnado would engage in lethal violence if a victim resisted, as Lafazia did. Or, as defendant put it, when "fat bro . . . just fought back." This factor weighs in favor of a finding of reckless indifference.

b. <i>Duration of the Crime</i>

In *Emanuel*, the Supreme Court observed that "[a] lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict and violence." (*Emanuel, supra*, 17 Cal.5th at p. 886; *Clark, supra*, 63 Cal.4th at p. 620 [the victim's prolonged restraint by the defendant increases the opportunity for violence and possible murder].) The evidence indicated that the time from when Emanuel and Whitley met with the victim until the gunshot was 14 minutes or less and the duration of the violent struggle less than that. (*Emanuel*, at p. 886.) The court concluded the "duration of the crime therefore is neutral in this case, it did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Ibid*.)

Here, the duration of the crime was no more than 10 minutes measured by the time between Lafazia's last message and the 911 call. During that time, the evidence-- consisting of defendant's jailhouse messages to Varnado, her testimony at trial, and defendant's and Varnado's interviews with a detective--was that defendant entered Lafazia's truck, a dispute that turned physical ensued, Varnado walked up, pointed a gun at Lafazia, demanded Lafazia give up everything he had, and then hit Lafazia with the gun. A short struggle over the gun followed, and culminated in Varnado shooting Lafazia; the struggle can be measured by defendant's testimony that she fled after Varnado hit Lafazia but still heard the gunshot. As in *Emanuel*, we conclude the duration factor was neutral and did nothing to heighten the risk beyond what was inherent in the robbery itself. (*Emanuel, supra*, 17 Cal.5th at p. 886.)

16

### c. *Efforts Taken to Minimize the Risk of Violence*

In *Emanuel*, our high court found that this factor did not support reckless indifference, because there was no evidence in the record that Emanuel planned a robbery involving weapons or knew that Whitley had a propensity for violence, and the crime occurred in the daytime in a public location where witnesses might be present. (*Emanuel, supra*, 17 Cal.5th at p. 887; see also *ibid.* [" 'the commission of the crime in daylight hours may have had the potential for minimizing violence[,]' " quoting *In re Scoggins, supra*, 9 Cal.5th at p. 683.)

Here, the evidence showed defendant planned a robbery that included Varnado's arming himself with a handgun, which she knew he had previously used to beat two compliant victims. Thus, unlike *Emanuel*, defendant planned a robbery involving a weapon and knew her confederate had a propensity for violence, because she had planned at least two such robberies in the recent past. In addition, as defendant told a detective, Varnado's role was to make sure she was safe, which increased the likelihood of lethal violence should Lafazia endanger her safety, as defendant testified happened. Finally, the robbery was planned to occur very late at night in the parking lot of defendant's apartment complex where it was unlikely witnesses would be present or have a good view of the happenings. We conclude this factor weighs slightly in favor of a finding of reckless indifference.

### d. *Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid Victims*

In *Emanuel*, the Supreme Court quoted *Clark* regarding this factor: " 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental

17

state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' " (*Emanuel, supra,* 17 Cal.5th at p. 889, quoting *Clark, supra*, 63 Cal.4th at p. 619.)

Here, defendant's callous reference to Lafazia in a jailhouse message as the "fat bro" who "just fought back" and was murdered betrays a lack of concern for the fate of the victim that may well have existed at the time of the crime. In *Emanuel*, the court recognized that a defendant's failure to render aid to the victim of lethal force may be reflective of the defendant's mental state. (*Emanuel, supra*, 17 Cal.5th at p. 893.) But in that case, considering the location (near a public park) and the time of day (the middle of the afternoon), the court said it could be inferred that Emanuel was motivated to flee the scene quickly to avoid arrest, whether or not he understood the extent of Sonenberg's injuries, particularly where the presence of others made it likely Sonenberg would receive aid without Emanuel's intervention. (*Id.* at p. 894.)

In this case, while the crime took place at night, it did occur in the parking lot of an apartment complex; witnesses did hear the shot and Lafazia's plea for help. As discussed, however, defendant's flight when Varnado and Lafazia struggled over the gun supports an inference that defendant left the violence necessary to accomplish the robbery to Varnado, indifferent to the risk to the victim.

Our high court further found that Emanuel's other postflight conduct (such as disposing of the phone used to contact Sonenberg) was too attenuated and revealed little about Emanuel's state of mind when the shooting occurred. (*Emanuel, supra,* 17 Cal.5th at pp. 894-895.) "While postflight conduct may shed light on a defendant's state of mind, conduct temporally removed from the violent act must clearly evince a culpable mental state." (*Id.* at p. 894.)

Here, defendant's postflight conduct included a jailhouse message that directed her codefendant to lie about the crime and did not express any surprise or regret that the robbery had ended in a murder and callously referred to the murder victim, acknowledging that he "just fought back." But "even if a defendant is unconcerned that the planned felony resulted in a death, there must also be evidence that the defendant was aware of and willingly involved in the violent manner in which the felony was committed and consciously disregarded the significant risk of death that his or her actions created." (*Emanuel, supra,* 17 Cal.5th at p. 895.) The *Emanuel* court reasoned that, "although Emanuel's conduct after the shooting may have been offensive, given the 'relative paucity' of other evidence support a finding of reckless indifference to human life, his culpability falls short of the benchmark set by section 189, subdivision (e)(3)." (*Emanuel*, at p. 895.)

Here, there was significant evidence supporting a finding of reckless indifference, including defendant's awareness of Varnado's propensity for violence toward compliant victims. Thus, defendant's jailhouse messages to Varnado support more than inference that she was unconcerned about the victim after the fact. It reflects a state of mind that could reasonably be found to have existed at the time of the crime--that Lafazia was likely to be killed because he fought back.

e.        *Totality of the Circumstances*

The court in *Emanuel* summarized the evidence as showing Emanuel planned a robbery in a public place in the middle of the afternoon, unarmed and unaware that Whitley was armed and likely to use lethal force. (*Emanuel, supra*, 17 Cal.5th at p. 895.)

Here, in contrast, defendant planned the third of three robberies in a parking lot in the middle of the night, unarmed but knowing that Varnado was armed and was likely to use extreme force, inflicted with a gun, even on compliant victims. She knew he was there to defend her if something happened; thus, it stands to reason that she was aware something might happen and knew she needed armed protection.

19

In *Emanuel*, nothing in the plan elevated the risk beyond that inherent in an armed robbery. (*Emanuel, supra*, 17 Cal.5th at p. 895.) The crime unfolded without a prolonged period of restraint, and Emanuel wanted to walk away when Sonenberg unexpectedly resisted, showing Emanuel was unwilling to engage in further violence to rob Sonenberg. (*Id.* at pp. 895-896.) Emanuel fled the scene without rendering aid after the shooting, but this fact had an ambiguous meaning, reflecting either a lack of regard for Sonenberg's welfare or a desire to escape, and therefore was insufficient to show Emanuel acted with reckless indifference to human life. (*Ibid.*)

In this case, the presence of the gun and Varnado's known propensity for violence, even where the victims complied with his demands, elevated the risk beyond that inherent in a robbery. Defendant saw Lafazia resist when Varnado pointed a gun at him, demanded everything he had, and struck him with the gun. Defendant did nothing to restrain or discourage Varnado. Rather, defendant fled as Lafazia and Varnado struggled over the gun. She heard Varnado shoot Lafazia but did nothing to render aid or even ascertain what had happened. Post arrest, defendant demonstrated a level of control over Varnado that supports an inference that he would have abandoned the plan to rob Lafazia when he resisted, if defendant had told him to do so. To the extent defendant's flight was ambiguous, reflecting her desire to escape as much as lack of regard for Lafazia's welfare, it also reflected defendant's plan to leave the violence necessary to accomplish the robbery to Varnado. Defendant's kite acknowledging they had previously committed "two violent robberies," and Varnado hit Lafazia "on his head, just like them two," but Lafazia was murdered because he "fought back" shows neither surprise nor remorse, but instead supports an inference that defendant was aware at the time of the crime that Varnado would use lethal violence in the face of Lafazia's resistance.

We conclude there was substantial evidence that defendant acted with reckless indifference to human life.

20

### 3. *Youth*

Lastly, defendant argues the trial court erred in not considering her youth--19 years old at the time of the crime--as a factor militating against a finding of reckless indifference. Defendant notes the court did not expressly address her youth at the evidentiary hearing. But she acknowledges the People submitted a supplemental brief arguing that defendant's youth did not minimize her culpability in Lafazia's murder and the court stated at the outset of the evidentiary hearing that it had read the parties' briefs. Moreover, as defendant also acknowledges, the prosecutor argued at the hearing that even a 19-year-old could have foreseen serious violence occurring to a noncompliant victim in an armed robbery, given that compliant victims were struck on the head with the gun.

In any event, the trial court's failure to mention defendant's youth does not mean the court ignored it. The evidentiary hearing was in 2024, well after the cases holding youth a factor relevant to reckless indifference. (*People v. Harris, supra*, 60 Cal.App.5th at p. 960.) We presume a trial court followed the law in exercising its duties and duly considered the evidence presented. (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092 ["the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence"]; see also *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [where "a statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order"].) Because the relevant law was established at the time of the evidentiary hearing, the record contained evidence of defendant's age and youth, and counsel argued the issue at the hearing, we presume the court properly considered defendant's youth as part of its analysis of reckless indifference.

Finally, even assuming the trial court did not consider defendant's youth, any such error is harmless. (See *People v. Oliver, supra*, 90 Cal.App.5th at pp. 488-489.) "[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative

21

impulsivity; and (2) their vulnerability to peer pressure." (*Ibid.*, citing, e.g., *Miller v. Alabama* (2012) 567 U.S. 460, 461.) The evidence here does not indicate that impulsivity or peer pressure motivated defendant's conduct. To the contrary, the record supports the court's conclusion that defendant was highly involved in the attempted robbery of Lafazia, as well as the robberies of C.C. and N.D., executed in the same manner, with defendant as the lure and compliant victims. She took a calculated risk that Lafazia would not resist either, and when he did, she left an armed Varnado to fight Lafazia, leading to the shooting and Lafazia's death. She was not the victim of peer pressure "swept up in circumstances beyond his or her control that led to an unintended death." (*Oliver,* at p. 489.) As the kites further established, defendant was in control of Varnado, with defendant meticulously planning their trial strategy.

Even after considering defendant's age, we conclude from the totality of the circumstances that substantial evidence supports the trial court's finding that defendant acted with reckless indifference to human life.[3]

---

[3] Because we conclude that substantial evidence supported the trial court's determination that defendant was a major participant in the attempted robbery of Lafazia and acted with reckless indifference to human life, we need not address the People's alternate theory that defendant aided and abetted implied malice murder. (See *People v. Wilson* (2023) 14 Cal.5th 839, 875.)

DISPOSITION

The trial court's order denying defendant's petition for resentencing under section 1172.6 is affirmed.

_____/s/_____
Duarte, Acting P. J.

We concur:

_____/s/_____
Feinberg, J.

_____/s/_____
Wiseman, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.